# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

*Electronically filed: November 3, 2022*

|  |  |
|---|---|
| JAMES DOYLE, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant, | ) |

No. 22-cv-00499-NBF

Hon. David Tapp

## Plaintiffs' Response to the Government's Motion to Dismiss

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760
roger@marzulla.com
nancie@marzulla.com

November 3, 2022

Counsel for Plaintiffs

# TABLE OF CONTENTS

I.    **Table of Contents** ...........................................................................................ii

II.   **Table of Authorities** ....................................................................................iii

III.  **Table of Exhibits** .........................................................................................vi

IV.  **Introduction** ...................................................................................................1

V.   **Factual and Procedural Background** .........................................................4

      A.    The Federal Endangered Species Act .............................................4

      B.    Doyle Acquires Valuable Land for Real Estate Development Which is Then Designated as Critical Habitat for the Mojave Desert Tortoise ............8

      C.    The Current HCP ...........................................................................9

      D.    Doyle's ITP Application ...............................................................12

      E.    Doyle's Unsuccessful Efforts to Obtain an Incidental Take Permit to Allow the Development of His Property ...................................13

      F.    Increased Pressures on FWS Since 2016 to Restrict Land Use to Protect Tortoises ........................................................................14

           1.    Northern Corridor Project .................................................16

           2.    Wildfires in Zone 3 ...........................................................17

      G.    Previous Litigation .......................................................................18

      H.    Procedural Background .................................................................19

VI.  **Argument** ......................................................................................................20

      A.  Standard of Review ........................................................................20

      B.  Argument .........................................................................................21

           1.    The Supreme Court has Reversed the Exhaustion of Administrative Remedies Requirement for Ripening a Taking Claim ..................................................................................22

           2.    There is No Question About How the Endangered Species Act Requirements Apply to Doyle's Property .....................................27

           3.    Under the Government's Theory, At No Time Will Doyle's Claim Ever Be Ripe for Review ......................................................30

           4.    Doyle's Taking Claim is Not Time-Barred ........................30

VII.  **Conclusion** ...................................................................................................31

**Table of Authorities**

Cases

*Anderson ex rel. Dowd v. City of Bos.*,
  375 F.3d 71 (1st Cir. 2004) ................................................................31
*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
  515 U.S. 687 (1995) ............................................................................5
*Barlow & Haun, Inc. v. United States*,
  805 F.3d 1049 (Fed. Cir. 2015) ....................................................23, 24
*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................5
*Boise Cascade Corp. v. United States*,
  296 F.3d 1339 (Fed. Cir. 2002) ....................................................23, 24
*Doyle v. United States*,
  129 Fed. Cl. 147 (Fed. Cl. 2016) ..................1, 9, 18, 19, 21, 31
*Han v. Lynch*,
  223 F. Supp. 3d 95 (D.D.C. 2016) .......................................................20
*Horne v. Dep't of Agric.*,
  569 U.S. 513 (2013) ....................................................................1, 23
*Jacobs v. United States*,
  290 U.S. 13 (1933) ............................................................................25
*Knick*,
  139 S. Ct. 2162 ....................................1, 21, 22, 23, 25, 26, 28
*Morris v. United States*,
  392 F.3d 1372 (Fed. Cir. 2004) ....................................................23, 24
*Moyer v. United States*,
  190 F.3d 1314 (Fed. Cir. 1999) ..........................................................21
*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ..........................................................................31
*Pakdel v. City & Cnty. of San Francisco, California*,
  141 S. Ct. 2226 (2021) ..................1, 4, 20, 22, 23, 25, 26, 27, 28
*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001) ..........................................................................24
*Reynolds v. Army & Air Force Exch. Serv.*,
  846 F.2d 746 (Fed. Cir. 1988) ............................................................21
*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ..........................................................................21
*Schooner Harbor Ventures, Inc. v. United States*,
  569 F.3d 1359 (Fed. Cir. 2009) ....................................................23, 24
*Seiber v. United States*,
  364 F.3d 1356 (Fed. Cir. 2004) ....................................................23, 24

*Sierra Club v. Lyng*,
   694 F. Supp. 1260 (E.D. Tex. 1988) ............................................................ 6
*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006) ................................................................ 30
*Suitum v. Tahoe Regional Planning Agency*,
   520 U.S. 725 (1997) ............................................................................ 23, 27
*Tennessee Valley Auth. v. Hill*,
   437 U.S. 153 (1978) .................................................................................. 5
*Thomas v. Washington Metro. Area Transit Auth.*,
   305 F. Supp. 3d 77 (D.D.C. 2018) ......................................................... 20
*United States v. Causby*,
   328 U.S. 256 (1946) ................................................................................ 26
*United States v. Ivey*,
   949 F.2d 759 (5th Cir. 1991) .................................................................... 6
*Wg. Woodmere LLC v. Town of Hempstead, No. CV 20-3903*,
   2021 U.S. Dist. LEXIS 160290, at *40-41 (E.D.N.Y. Aug. 23, 2021) ......... 21
*Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*,
   473 U.S. 172 (1985) ..................................... 1, 18, 21, 22, 23, 24, 25, 26, 29

## Statutes

16 U.S.C. §1540(b) ......................................................................................... 6
16 U.S.C. § 1532(5)(A) .................................................................................. 5
16 U.S.C. § 1532(19) ................................................................................. 6, 27
16 U.S.C. § 1532(20) ..................................................................................... 5
16 U.S.C. § 1536 ............................................................................................ 7
16 U.S.C. § 1538(a)(1) ................................................................................... 5
16 U.S.C. § 1539(a)(1)(B) .............................................................................. 7
16 U.S.C. § 1539(a)(2)(A) .............................................................................. 7
16 U.S.C. § 1539(a)(2)(A), (B) ....................................................................... 7
16 U.S.C. § 1539(a)(2)(B)(iii) ......................................................................... 7
16 U.S.C. § 1539(c) ....................................................................................... 7
16 U.S.C. § 1540(a) ....................................................................................... 6
16 U.S.C. § 1540(e), (g) ................................................................................. 6
16 U.S.C. §§ 1531–1544 ................................................................................ 2
16 U.S.C. §§ 1538–1539 ........................................................................... 2, 28
42 U.S.C. §1983 ...................................................................................... 23, 25
Pub.L. No. 111-11, 123 Stat. 991 ................................................................... 9

## Regulations

50 C.F.R. Parts 13 and 17 .............................................................................. 7
50 C.F.R. §17.3(c) .......................................................................................... 6

50 C.F.R. § 17.3 ................................................................................................27
50 C.F.R. § 402.01 ............................................................................................28
50 C.F.R. § 424 ..................................................................................................5
50 C.F.R. § 424.12 ............................................................................................28
*Determination of Critical Habitat for the Mojave Population of the Desert Tortoise*,
    59 Fed. Reg. (Feb. 8, 1994) ........................................................................8
*Notice of Intent to Prepare an Environmental Impact Statement To Consider a Highway
    Right-of-Way With Associated Issuance of an Incidental Take Permit, and Resource
    Management Plan Amendments, Washington County, Utah*,
    84 Fed. Reg. 66692 (Dec. 5, 2019) ............................................................9
*Permit for Incidental Take of Threatened Species*,
    61 Fed. Reg. 26, 529 (May 28, 1996) ......................................................2, 9

**Table of Exhibits**

Exhibit 1:    Habitat Conservation Plan For Washington County, Utah (Oct. 2020)

Exhibit 2:    Declaration of T. Anderson (Nov. 3, 2022)

Exhibit 3:    Declaration of J. Doyle (Nov. 3, 2022)

Exhibit 4:    Incidental Take Permit (Jan. 13, 2021)

Exhibit 5:    Incidental Take Permit Application (Mar. 31, 2020)

**Plaintiffs' Response to Government's Motion to Dismiss**

Plaintiffs, James Doyle, an individual doing business as Rocky Mountain Ventures and Environmental Land Technologies, Ltd. (collectively "Doyle"), oppose the Government's motion to dismiss. The Government's argument for dismissal rests on Doyle's failure to apply for and be denied an incidental take permit from the U.S. Fish and Wildlife Service (FWS), an argument the Government successfully made in obtaining a dismissal of Doyle's taking case in an earlier lawsuit.[1]

But the law has dramatically changed since the earlier lawsuit was dismissed. Since then, the Supreme Court has flatly overruled the seminal case on which the trial court's dismissal was based.[2] Under the law, as it now exists, Doyle need not go through the motions of applying for a permit and being denied a permit to ripen his taking claim for review: "The rationales for the finality requirement underscore that nothing more than *de facto* finality is necessary."[3]

Here, the FWS listed the Mojave Desert Tortoise as a threatened species in 1990, and then designated most of Washington County, Utah as critical habitat (including Doyle's property). At the time, this listing and designation made most of Washington County one of the fastest-growing counties in the country, but off limits from

---

[1] *Doyle v. United States*, 129 Fed. Cl. 147 (Fed. Cl. 2016).

[2] *See Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985), *overruled by Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167 (2019) and *Pakdel v. City & Cnty. of San Francisco, California*, 141 S. Ct. 2226 (2021).

[3] *Pakdel*, 141 S. Ct. at 2230 (quoting *Horne v. Dep't of Agric.*, 569 U.S. 513, 525 (2013)).

development. The federal Endangered Species Act (ESA) forbids the take of any listed species, including interference with breeding, feeding, and reproduction or disturbance of any habitat.[4]

Under the ESA, no development is the baseline and issuing an Incidental Take Permit (ITP) is the exception.[5] Here, Doyle and other affected landowners proposed a Habitat Conservation Plan (HCP) to allow for some development of their land. But FWS rejected their proposal.[6] Washington County then developed a county-wide HCP and negotiated with FWS for the issuance of an Incidental Take Permit.[7] The FWS-approved HCP does not include Doyle's residential development plans as a "covered" (allowed) activity.[8] Indeed, Doyle's land is included within the core area of the highly protected Red Cliffs Wildlife Reserve for the tortoise and enclosed by "tortoise fencing."[9]

Under the County's HCP, a joint board of FWS, County, and a few city officials was created—the Habitat Conservation Committee—to decide what development is allowed under the HCP and what is not allowed. Doyle has repeatedly appeared before this Committee and been told that he cannot develop his land.[10] In addition, most of the County is now developed, and the preserved habitat, including Doyle's land, must remain

---

[4] 16 U.S.C. §§ 1531–1544.

[5] 16 U.S.C. §§ 1538–1539.

[6] Compl. for Fifth Amendment Just Compensation ¶ 13 (May 6, 2022), ECF No. 1.

[7] *Id*. ¶ 14; *see Issuance of Permit for Incidental Take of Threatened Species*, 61 Fed. Reg. 26, 529 (May 28, 1996).

[8] *See* Habitat Conservation Plan For Washington County, Utah at i-ii (restated & amended Oct. 2020) ("2020 Plan") (attached as Ex. 1).

[9] *See* Decl. of Timothy Burton Anderson at 2 (attached as Ex. 2); Decl. of James Doyle ¶ 11 (attached as Ex. 3).

[10] *See generally* Ex. 2.

2

undeveloped to mitigate for past development.[11] Allowing Doyle to develop his land at this point would overturn the balance struck in the County's amended 2020 HCP between allowing more County development, notably the Northern Corridor Project (a four-lane highway that crosses through the core area of sensitive tortoise habitat) and continued habitat conservation.

In addition, over the last 25 years, the Bureau of Land Management has purchased much of the land within the tortoise reserve, leaving Doyle's land stranded along with the land of several other landowners in the most sensitive area of the tortoise reserve.[12]

Having controlled Doyle's land for over a quarter of a century, rejecting his original HCP, refusing to approve his development plans, and promising to buy his land, but failing to do so, it is now time for the Government to pay Doyle the just compensation to which he is constitutionally entitled. The Government's suggestion that Doyle *might* be able to develop his land, without identifying where or how Doyle could mitigate for any habitat disturbances that would result from his development, is simply not credible.

Doyle, therefore, asks this Court to deny the Government's motion to dismiss, holding that his taking claim is ripe for review.

---

[11] *Id.*
[12] *Id.*

**Issues Presented for Review**

1.    The trial court dismissed Doyle's original taking claim because Doyle had not been denied a permit to develop his property. The Government's current motion to dismiss is based on the same law relied on by the trial court in that dismissal. But the law has since changed, and the standard today is only a "modest" showing of how the "regulations at issue apply to the particular land in question."[13] Because the facts establish that there is no chance that FWS will approve a permit allowing Doyle to develop residential houses within the core area (Zone 3) of the Reserve, should the Court deny the Government's motion to dismiss?

2.    The Government mentions in a footnote, but never develops an argument, that Doyle's taking claim is time-barred. Has the Government waived its right to argue for the first time in its reply brief that Doyle's taking claim is time-barred? And because the trial court ruled in the prior lawsuit that Doyle's taking claim was timely brought, is the Government estopped from relitigating an issue it previously raised and lost in the earlier litigation?

**Factual and Procedural Background**

    **A.**    **The Federal Endangered Species Act**

The federal ESA has been called the most powerful environmental statute in the world, and the Supreme Court has declared that species listed under the Act must be

---

[13] *Pakdel,* 141 S. Ct. at 2230.

protected "whatever the cost."[14] The 1973 legislation makes it unlawful for any person to kill, injure, or capture a protected animal, which could include habitat modification.[15] Under the Act, an endangered species is one on the brink of extinction. In contrast, a threatened species is one that "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."[16]

Once a species is determined to be endangered or threatened, the FWS must designate areas considered "critical habitat."[17] Critical habitats are those land areas that (1) contain physical and biological attributes essential to the continued conservation of the species and (2) may require special management considerations and protections.[18] Critical habitat is land "essential to the conservation of the species. . . ."[19]

Once a species is listed under the ESA, various programs kick in that protect and conserve the species, including a set of prohibited acts that apply to all individuals, and protect listed species from actions such as habitat modification.[20] Section 9 of the ESA sets forth a variety of prohibitions designed to protect a listed species, including the prohibition against any person "taking" any endangered species of fish or wildlife.[21]

---

[14] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978).
[15] *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 690 (1995).
[16] *See* 16 U.S.C. § 1532(20).
[17] 50 C.F.R. § 424.
[18] *See* 16 U.S.C. § 1532(5)(A).
[19] *Id.*
[20] *Accord Bennett v. Spear,* 520 U.S. 154, 170 (1997) (stressing the "powerful coercive" and "virtually determinative" effect of biological opinions).
[21] *See* 16 U.S.C. § 1538(a)(1).

Section 9 broadly defines the term "take" to include actions such as to "harass, harm, pursue, hunt, short, wound, kill, trap, capture, or collect"[22] an endangered animal species or any "attempt to engage in any such conduct."[23] Evidence of the actual death of members of a species is not required to prove that activity has or will constitute a take—evidence of harm is sufficient. FWS defines "harm" to include any act that results in "significant habitat modification or degradation . . . significantly impairing essential behavior patterns."[24]

The ESA contains detailed provisions regarding the enforcement of these prohibitions by both the federal government and citizen groups.[25] A knowing violation of the prohibitions of Section 9 of the Act, including unauthorized take of a listed species, can result in a $25,000 fine for each violation.[26] Certain knowing violations may result in criminal fines of up to $50,000 and up to a year in prison.[27] As a strict liability provision, a criminal conviction does not require proof that an individual *intended* to violate the law, only that the individual *knew* that he or she was engaging in the activity that resulted in the violation.[28]

---

[22] 16 U.S.C. § 1532(19).

[23] *Id.*

[24] 50 C.F.R. §17.3(c); *see also Sierra Club v. Lyng*, 694 F. Supp. 1260 (E.D. Tex. 1988), *aff'd in part, vacated in part sub nom. Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir. 1991) (interference with breeding, shelter, and feeding of a listed species establishes "harm").

[25] *See* 16 U.S.C. § 1540(e), (g).

[26] 16 U.S.C. § 1540(a).

[27] 16 U.S.C. §1540(b).

[28] *United States v. Ivey*, 949 F.2d 759 (5th Cir. 1991).

FWS may authorize the take of a listed species by issuing a Section 10(a) permit (Incidental Take Permit).[29] To obtain a Permit, the applicant (or, more commonly, the applicant's environmental consultants) must prepare a Habitat Conservation Plan and set forth sufficient protection and mitigation measures to ensure that the project's impacts will be minimal.[30] Before the Permit can be approved, there must be notice and an opportunity for public comment.[31] In addition, because issuing a Section 10(a) permit is a federal action, FWS must comply with the National Environmental Protection Act (NEPA). NEPA compliance typically adds at least another year or more to the permit approval process. Further delaying the permit approval process is the fact that FWS is also required under Section 7 of the ESA to consult with other agencies before issuing a NEPA Record of Decision (ROD) or Finding of No Significant Impact (FONSI).[32]

Funding is a major issue for every HCP, as Section 10(a) requires a demonstration that "adequate funding for the plan will be provided."[33] For example, a recent article in the Journal of the Society for Conservation Biology found that the median cost for the implementation stage of an HCP was $71,018,570 for large-scale HCPs and $908,507 for project-scale HCPs.[34] In another instance, a landowner in San Bruno Mountain had to

---

[29] 16 U.S.C. § 1539(a)(1)(B).
[30] 16 U.S.C. § 1539(a)(2)(A), (B); *Id*. at 3-4.
[31] 16 U.S.C. § 1539(a)(2)(A); *see also* 16 U.S.C. § 1539(c); 50 C.F.R. Parts 13 and 17.
[32] *See* 16 U.S.C. § 1536.
[33] 16 U.S.C. § 1539(a)(2)(B)(iii).
[34] *See* Ex. 2 at ¶ 6 (citing Surrey et. al., *Habitat Conservation Plans Provide Limited Insight Into the Cost of Complying with the Endangered Species Act*, JOURNAL OF THE SOCIETY FOR CONSERVATION BIOLOGY at 7 (Feb. 23, 2022) https://conbio.onlinelibrary.wiley.com/doi/pdf/10.1111/csp2.12673#:~:text=The%20medi an%20cost%20for%20the,for%20a%20project%2Dscale%20HCP.)

contribute over $1 million for the biological studies about butterflies and other grassland species on the mountain for its Section 10(a) permit.[35]

### B.    Doyle Acquires Valuable Land for Real Estate Development Which is Then Designated as Critical Habitat for the Mojave Desert Tortoise

Before the 1990 designation of the Mojave Desert Tortoise as a threatened species, Doyle had acquired 2,440 acres of valuable land for development and preferential rights to an additional 11,000 acres of former School Trust Lands in Washington County, Utah, and had invested significant resources into planning the development with luxury homes and nine golf courses.[36]

Before he commenced development, on February 8, 1994, all of Doyle's land was designated as a "critical habitat" for the Mojave Desert Tortoise.[37] Doyle originally worked with other landowners and county, state, and federal officials to propose a county-wide HCP that would have allowed him and other affected private landowners to develop a portion of their land.[38] But the U.S. Fish and Wildlife Service (FWS) rejected that proposal because insufficient land was set aside to protect the tortoise.[39] Later, FWS accepted an HCP prepared by Washington County that set aside 350,000 acres of tortoise habitat, including a 61,022-acre area as Mojave Desert Habitat Reserve, also known as

---

[35] *Id.*

[36] *See* Compl. ¶ 5, 9; *see also* S. Hrg. 107-67 at 3 (May 10, 2001).

[37] Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Mojave Population of the Desert Tortoise, 59 Fed. Reg. 5, 820 (Feb. 8, 1994).

[38] *See* Ex.3 at ¶ 3.

[39] *Id*.

the Red Cliff Desert Reserve.[40] On February 23, 1996, FWS issued an Incidental Take

Permit (ITP) based on the HCP submitted by Washington County.[41]

On March 30, 2009, Congress further designated 44,725 acres of federally owned

land with the Reserve as the Red Cliffs National Conservation Area, intended to provide

even greater protection of the tortoise habitat within the Red Cliffs Desert Reserve.[42]

Doyle's land is within this Red Cliffs National Conservation Area, and because of its

importance to the tortoise, Congress authorized the Secretary of Interior to purchase

"private land [including Doyle's] within the area."[43]

### C.    The Current HCP

The original Permit that FWS issued to Washington County in 1996 was for 20

years and expired on March 14, 2016.[44] FWS approved a restated and amended HCP on

October 13, 2020, which extended the County's access to authorized, but unused,

incidental take of 66,301 acres of tortoise habitat for an additional term of 25 years.[45] The

ITP effectuating the 2020 HCP became effective on January 15, 2021, and will not expire

---

[40] Issuance of Permit for Incidental Take of Threatened Species, 61 Fed. Reg. 26, 529
(May 28, 1996).
[41] *Id.*
[42] *See* Omnibus Public Land Management Act of 2009, Pub.L. No. 111-11, 123 Stat. 991
(March 30, 2009).
[43] *Doyle*, 129 Fed. Cl. at 150 n.5.
[44] *See Implementation Agreement for the Washington County Habitat Conservation Plan*
(Amended 2020) at 2 ¶ H; Notice of Intent to Prepare an Environmental Impact
Statement To Consider a Highway Right-of-Way With Associated Issuance of an
Incidental Take Permit, and Resource Management Plan Amendments, Washington
County, Utah, 84 Fed. Reg. 66692, 66693 (Dec. 5, 2019).
[45] *See* Ex. 1.

until January 15, 2046.[46]

The Permit again identifies Washington County, Utah as the Permittee and provides for the incidental take of tortoises resulting from otherwise lawful conduct of covered activities, as described in the Amended HCP . . . on habitat assumed to be occupied by the Mojave desert tortoise within the 2020 HCP take areas.[47] The Permit uses habitat acres as a "surrogate metric" for direct take of Mojave Desert Tortoises.[48]

The "Plan Area" for the 2020 HCP includes all of Washington County,[49] but the actual Permit Area is the Upper Virgin River Recovery Unit, a subset of the HCP Area.[50] FWS estimates approximately 325,898 acres of tortoise habitat of variable quality within the Permit Area.[51] The 2020 Plan includes the incidental take of desert tortoises associated with habitat loss of 66,301 acres on non-federal lands in the Permit Area.[52] These 66,101 acres are largely outside the Reserve, only up to 200 acres of habitat loss can occur inside the Reserve where Doyle's property is located.[53]

Allowable activities on non-federal lands (including private lands) that will impact tortoise habitat within the Permit Area are known as "covered activities."[54] What

---

[46] Incidental Take Permit at 1 (attached as Ex. 4). There is a discrepancy in the effective dates of the ITP as the pages after page 1 indicate that the ITP is effective on January 13, 2021 and expires on January 13, 2046.
[47] Ex. 4 at 3.
[48] Ex. 1 at 4.
[49] *See* Ecological Services, Finding, and Recommendations at 6.
[50] *Id*.
[51] *Id*.
[52] *Id*. Title 50, Section 13.22
[53] *Id*.
[54] Ex. 1 at iii.

activities qualify as a covered activity inside the Reserve is distinctly different from what qualifies as a covered activity outside the Reserve.[55] Outside the Reserve, a broad set of land development and land use activities can occur on non-federal lands, such as land clearing and building construction, grazing and farming, utilities and other infrastructure, resource extraction, and renewable energy development.[56]

But inside the Reserve, covered activities are limited to 200 acres exclusively for the following uses: utility, water development, and flood control activities; management of the Reserve; and certain other specific uses.[57] The 2020 HCP identifies only the following as "covered" or authorized activities within the Reserve: recreation uses and related facilities (e.g., hiking, birdwatching, photography); construction, use, and operation of utilities, access roads, water development, and flood control; and activities associated with general Reserve management (e.g., vegetation management, firefighting).[58] Now, the 2020 HCP further limits "covered" activities within Zone 3 of the Reserve to the following: operation and use of the City of St. George law enforcement training range; operating and maintaining the debris basin behind City Creek dam, Pioneer Park, and other various infrastructure facilities.[59] Notably, the development of residential housing is not included on the list of covered activities within Zone 3. The Reserve is divided into Zones 1-5, and Doyle's property is located entirely within Zone

---

[55] *Id*.

[56] *Id*.; *see id.* at 12 (list of covered activities allowed outside of the Reserve).

[57] *Id*. at i-ii; *see id.* at 11.

[58] *Id.* at 13-14

[59] *Id.* at 14.

3.[60] Zone 3 comprises an area further fragmented into three "subunits" by tortoise

fencing.[61] Zone 3 contains the largest block of contiguous tortoise habitat and is

considered "the core of the Reserve."[62]

And although the HCP states that it does not "expressly prohibit uses of the

Reserve that are not Covered Activities,"[63] the HCP explicitly warns landowners who do

not enter into an exchange agreement for their land within the Reserve will be subject to

the "enforcement provisions" under the ESA:

> Landowners have been consulted throughout the HCP process and have been
> encouraged to participate in these land exchanges [for Reserve acquisition].
> In the event they do not, the HCP will have no legal effect on their property,
> and the HCP will place no restrictions on land use within the Reserve.
> However, such lands will not participate in the benefits and protections
> inherent in the incidental take permit issued as part of the HCP, and *therefore
> the landowner will be subject to the Section 9 enforcement provisions under
> the Act*.[64]

### D.    Doyle's ITP Application

In Doyle's application for an ITP, he described the development he sought as "low

density clustered development containing three units per acre totaling 799

developments."[65] On its face, Doyle's proposed development falls outside the list of

covered activities under the 2020 HCP. His only remedy under the HCP, therefore, is to

---

[60] *See* Ex. 1 at 78-79.
[61] *See id.*; *see also id.* at 42.
[62] *Id*. at 78.
[63] *Id.*
[64] *Id.* (emphasis added).
[65] Incidental Take Application at 2 (Mar. 31, 2020) (attached as Ex. 5).

sell his land to or reach an agreement with the Bureau of Land Management to exchange his land within the Reserve for comparable land elsewhere that he could develop.[66]

Although Doyle has been able to sell some of his land to the Bureau of Land Management and has lost a significant number of acres of his land in bankruptcy during the pendency of this litigation, his remaining land remains locked in the Reserve. Over the years, Doyle has engaged in repeated and extended unsuccessful negotiations with the Government in an effort to sell or exchange his remaining property.[67] The HCP itself acknowledges that Reserve land acquisitions are "incomplete," with only 60% of the target acreage deemed acquired for conservation purposes.[68]

### E.    Doyle's Unsuccessful Efforts to Obtain an Incidental Take Permit to Allow the Development of His Property

Doyle submitted an Incidental Take Application on March 31, 2020.[69]  In a cover letter attached to his application, Doyle states that for more than three years, he has discussed with FWS personnel, including two face-to-face meetings, in which he explained his desire to obtain a permit that would allow him to develop 266.4 acres of his land within the Reserve.[70] Doyle's letter further explains that he has been

> seeking final and clear acknowledgment of, at the very least, the probability of a denial of my request to build on my 266.44 acres. After the travail of

---

[66] Ecological Services, Findings, and Recommendations at 19-20. Notably, the County considered and rejected an alternative in the 2020 Plan that would have included less private land in the Reserve, including landowners who "do not have a ready means to address ESA compliance for the desert tortoise and would need to apply for independent permits under Section 10."

[67] *See* Ex. 2 at ¶ 8; Ex. 3 at ¶¶ 5-11.

[68] Ex. 1 at 69.

[69] Ex. 5.

[70] *Id.* at 1.

thirty years of waiting for my Reserve lands to be acquired, I was requesting that the inaction for acquisition be supported by a letter reflecting the reality of the impossibility of allowing development on [my property].[71]

Doyle also states that a Bureau of Land Management employee, Larry Crist, told him that his office did not have the time or resources to process his application but that he might know someone "who perhaps would write a letter denying the ability to issue a permit and, subsequently, to issue a letter/statement denying any application that would allow me to proceed with a land exchange or pursue other remedies to which I have the right."[72]

An addendum to the application, dated October 7, 2019, explains: "By the application, ELT/DOYLE asks [BLM] to determine whether development of his 266 acres within the Red Cliffs National Conservation Area may be developed and, if so, to approve the development plan for this property in accordance with his application."[73]

The FWS has refused to approve or deny his Permit Application.

## F.  Increased Pressures on FWS Since 2016 to Restrict Land Use to Protect Tortoises

Current events make it even more unlikely that the FWS would ever grant Doyle a permit to develop his property. The Mojave Desert Tortoise population is continuing to decline. Its critical habitat in Zone 3, the core of the Reserve, has been significantly fragmented and reduced by the construction of a four-lane highway and is being decimated by a series of severe wildfires.

---

[71] *Id.*
[72] *Id.* at 2.
[73] *Id.* at 17.

Despite the significant land and habitat set aside to protect the Desert Tortoise since 1996, FWS's efforts to enhance the population of the tortoise in the Reserve have been largely unsuccessful: "[T]he Reserve population has consistently been considered lower than at establishment and is now approximately 44 percent lower than the minimum abundance target set by the recovery office in 1994[.]"[74]

The tortoise fence is distinctive because it is merely a wire cattle fence about four feet high. But the lower 18 inches has a very tight metal mesh at its lower side buried into the ground to keep the tortoises from escaping the tortoise reserve by burrowing under. These fences go for many miles and Washington County HCP staff constructed them. The name "Desert Reserve" appears on the plaques along the fence at certain points. The HCP staff maintains the fences.

---

[74] Ecological Services, Findings, and Recommendations at 37.



Figure 1: Picture taken by James Doyle of Tortoise Fencing on his land. *See* Ex. 3 at 5.

### 1.  Northern Corridor Project

A significant impact to Zone 3 since 2016 is the approval in 2021 of a right-of-way application submitted by the Utah Department of Transportation to the Bureau for the "Northern Corridor Project"—a four-lane highway that crosses through Zone 3. Even though the Project had not yet been approved, the 2020 Plan included a "Changed Circumstance" analysis of the Project due to the high likelihood that it would occur.[75] The Plan Changed Circumstance analysis identifies new protective measures that will go

---

[75] *Id*. at 126.

into effect if two triggering events approving the Project occur, both of which have now taken place.[76]

The Project crosses non-federal lands within Reserve Zone 3 that are designated Critical Habitat for the tortoise.[77] Approval of the Project required the County to "retire" previously authorized take to help offset the Project's adverse effects on the conservation value of Reserve Zone 3.[78] Adverse impacts of the Project include the direct loss of 276 acres and habitat degradation and fragmentation of 2,343 additional acres to the Reserve in Zone 3.[79] These impacts affect the Reserve values and add significant new stressors on the tortoise habitat within the Reserve.[80] FWS estimates that 21% of the Zone 3 subpopulation may be affected directly or indirectly by the Project alone.[81]

### 2.    Wildfires in Zone 3

In addition to the construction of the Project through Zone 3, wildfires have also destroyed habitat and killed individual tortoises in Zone 3. From 2020 through mid-

---

[76] *Id.* at 127; *see Biological Opinion for the Northern Corridor Highway Project* (Jan. 12, 2012) available at fws.gov/sites/default/files/documents/Northern%20Corridor%20Final%20Biological%20Opinion.pdf; U.S. Department of the Interior Bureau of Land Management, *Record of Decision and Approved Resource Management Plan Amendments for the Northern Corridor Right-of-way, Red Cliffs National Conservation Area Resource Management Plan, & St. George Field Office Resource Management Plan* (Jan. 13, 2021), available at eplanning.blm.gov/public_projects/1502103/200341977/20034449/250040647/Record%20of%20Decision%20and%20Approved%20RMP%20Amendments_BLM_2021.01.13.pdf (Northern Corridor Biological Opinion).

[77] Ex. 1 at 126.

[78] *Id.* at 135.

[79] Ecological Services, Findings, and Recommendations at 16.

[80] *Id.*

[81] *Id.*

October, three wildfires burned a combined 11,754 acres within Reserve Zone 3, of which 8,814 were designated as the tortoise's critical habitat.[82] At least 14 tortoises were killed in these fires.[83] Even before the 2020 fires, approximately 13,506 acres of the Reserve area (30% of 44,859 total acres) burned between 2000 and 2015.[84] During the summer of 2005, multiple large lightning-caused fires within the Reserve burned approximately 10,244 acres of desert tortoise critical habitat and 1,267 acres of additional desert tortoise habitat within the Reserve.[85] It is estimated that wildfires killed 15% of all adult tortoises within Reserve Zone 3 in 2005.[86]

### G.    Previous Litigation

On November 30, 2016, the trial court dismissed *Doyle*'s previous lawsuit as unripe.[87] Although the Court ruled in Doyle's favor on the Defendant's statute of limitations argument, it ruled against Doyle's breach of contract claim, and takings claim under the Fifth Amendment. In ruling against Doyle's takings claim, the Court found that the claim was not ripe because Doyle had not personally applied for an incidental take permit. The court explained that since Doyle had not applied for and been denied an incidental take permit, he had not exhausted his administrative remedies with the FWS, and there was not a final decision by the Government to ripen Doyle's taking claim.[88]

---

[82] Ex. 1 at 36.
[83] Northern Corridor Biological Opinion at 45.
[84]  Northern Corridor Biological Opinion at 42
[85] *Id.*
[86] *Id.*
[87] *See Doyle v. United States*, 129 Fed. Cl. 147, 160 (2016).
[88] *See Williamson Cnty. Reg'l Plan. Comm'n*, 473 U.S. at 186 (1985) (holding that the "taking of a property interest is not ripe until the government entity charged with

The trial court also ruled against Doyle's futility exception to the Government's argument for the exhaustion of administrative remedies. Doyle's complaint alleged that Doyle's life work had been the accumulation of this acreage to develop a luxury home and golf course subdivision on the outskirts of St. George, Utah—plans that collapsed when Doyle's property was designated critical habitat and included within the Zone 3 of the HCP's "Reserve Lands"—an area where "[n]o incidental take of desert tortoises will be allowed."[89]

The Government argued, successfully, that despite the FWS's approval of a HCP that included Doyle's property within the Reserve, where incidental take was prohibited, there remained a possibility, however minuscule, that FWS may entertain an HCP and ITP directly submitted by Doyle to allow just that.

## H.    Procedural Background

On November 30, 2016, the Court dismissed Doyle's prior taking suit on the grounds that Plaintiff's claim was not ripe for review because he did not submit his own Incidental Take Permit (ITP) application for his privately held land.[90] Although Doyle explained that he did submit two ITPs through his participation in the steering committee with Washington County, the Court reasoned that since Doyle did not "personally" submit an incidental take permit to the U.S. Fish and Wildlife Service, "it cannot be said that plaintiffs have already applied for and been denied an incidental take permit that

---

implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.").

[89] *See* Ex. 1 at 111.

[90] *See Doyle*, 129 Fed. Cl. at 160.

precludes development of their property."[91] In addition, at the time the Court issued its

Judgment on November 30, 2016, Washington County's ITP had expired earlier in

2016.[92] Although the county had applied for a renewal, the permit was in a state of limbo

with no certainty that the Government would renew or extend the ITP. Nevertheless, in

the new HCP that FWS required for the ITP renewal, the Government made it clear, yet

again, that Doyle's property must remain within the Reserve Lands where incidental take

is prohibited.[93]

In 2020, Doyle submitted a personal ITP application to FWS, which incorporated

the County's Habitat Conservation Plan to satisfy the requirement for an accompanying

HCP. But, again, FWS refused to process Doyle's permit application because Doyle had

not submitted a personal habitat conservation plan.[94]

**Argument**

**A.    Standard of Review**

While the plaintiff bears the burden of proving that their claim is ripe for review,

courts have stated that burden is "modest."[95] In a motion to dismiss, courts "treat the

plaintiff's factual allegations as true and afford the plaintiff the benefit of all interferences

that can be derived from facts alleged."[96] When a party challenges the truth of

---

[91] *Id*. at 156 n.10 (emphasis added).

[92] Ex. 4 at 1.

[93] Ex. 1 at Figure 8 at 41.

[94] *See* Ex. 2  at ¶ 4; *see also* Ex. 3 at ¶ 3.

[95] *Pakdel*, 141 S. Ct. at 2230.

[96] *Thomas v. Washington Metro. Area Transit Auth.*, 305 F. Supp. 3d 77, 81 (D.D.C. 2018) quoting *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016).

jurisdictional facts in a complaint, the court can engage in fact-finding by going beyond the pleadings[97] and "may consider relevant evidence in order to resolve the factual dispute,"[98] the role of the court in a jurisdictional challenge under Rule 12(b)(1) remains a limited one, and "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[99]

## B.    Argument

In granting the Government's motion to dismiss Doyle's first lawsuit for lack of ripeness, the trial court relied on a line of cases holding that a taking claim is not ripe until a permit application has been denied. Since Doyle had not submitted a personal permit application, the trial court found that Doyle's takings claim was not ripe.[100] The trial court's ruling was based on the seminal case, *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*,[101] which the Supreme Court has since reversed, rejecting the rationale for that ripeness requirement.[102] Subsequent decisions have confirmed that the former exhaustion-of-administrative-remedies rule no longer applies.[103]

---

[97] *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999).

[98] *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).

[99] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

[100] Op. at 18-23, *James Doyle, et al., v. United States*, No. 15-572L (Fed. Cl. Nov. 30, 2016), ECF No. 33.

[101] *Williamson Cnty. Reg'l Plan. Comm'n*, 473 U.S. at 186.

[102] *See generally Knick*, 139 S. Ct. 2162.

[103] *See, e.g., Wg. Woodmere LLC v. Town of Hempstead*, No. CV 20-3903, 2021 U.S. Dist. LEXIS 160290, at *40-41 (E.D.N.Y. Aug. 23, 2021) (Explaining that "although a land use claim is not ripe where the Federal Court does not yet know the extent of the local regulation that will be applied to the property at issue . . . this is not the same as requiring that a plaintiff exhaust remedies, *or even that a plaintiff apply for a permit prior to commencing a Federal action*[.] . . . [T]he ripeness question is not properly answered by asking whether all (or any) state applications or variances have been made, but by

The Government's motion to dismiss Doyle's complaint again rests on the argument that Doyle has failed to ripen his taking claim because the FWS has never denied his permit application. Because that argument is based on cases and a rationale that is no longer good law, the Government's motion to dismiss should be denied.

### 1. The Supreme Court has Reversed the Exhaustion of Administrative Remedies Requirement for Ripening a Taking Claim

The Government's argument that this Court lacks Tucker Act jurisdiction over Doyle's Fifth Amendment taking claim is foreclosed by two recent decisions of the U.S. Supreme Court. In *Knick*[104] and *Pakdel*,[105] the Supreme Court held that "exhaustion of state remedies is *not* a prerequisite"[106] to bringing a federal taking claim, overruling its prior holding in *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank* [107] on which the Government's cases rely. The plain fact is that the law has changed—and the cases the Government cites are no longer good law.

First, in *Knick*, the Supreme Court held that a property owner was not required to exhaust the state's compensation remedy before filing a taking claim, overruling its contrary holding in *Williamson County*: "Contrary to *Williamson County*, a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it."[108] The Court went on to state that

---

determining whether the government position as to the plaintiff's property is clear.") (emphasis added).

[104] 139 S. Ct. 2162.

[105] 141 S. Ct. 2226.

[106] *Id.* at 2230 (emphasis added).

[107] 473 U.S. 172, *overruled by Knick*, 139 S. Ct. 2162 *and Pakdel*, 141 S. Ct. 2226.

[108] *Knick*, 139 S. Ct. at 2170.

Williamson County "effectively established an exhaustion requirement for § 1983 takings claims," which, had it been recognized at the time, "its error would have been clear."[109]

Next, in *Pakdel*, the Supreme Court revisited the exhaustion of remedies requirement, and building on its holding in *Knick*, held in no uncertain terms that exhaustion of administrative remedies is not required to ripen a Fifth Amendment taking case. Reversing the Ninth Circuit, the Supreme Court held that the finality required to ripen a taking case "is relatively modest," and that "[a]ll a plaintiff must show is that 'there [is] no question ... about how the 'regulations at issue apply to the particular land in question.'"[110] Contrary to the now-overruled *Williamson County* holding on which the Government relies, "nothing more than *de facto* finality is necessary" to ripen a taking case; the property owner need only show that he "has actually 'been injured by the Government's action' and is not prematurely suing over a hypothetical harm."[111]

In moving to dismiss Doyle's prior taking suit, the Government—as it does in this motion, too—relied on a string of cases, all of which based their rulings on the recently overruled *Williamson County* requirement that a property owner exhaust administrative remedies before filing a taking case: *Barlow v. Haun, Inc.*,[112] *Schooner Harbor Ventures, Inc. v. United States*,[113] *Seiber v. United States*,[114] *Morris v. United States*,[115] *Boise*

---

[109] *Knick*, 139 S. Ct. at 2173.

[110] *Pakdel*, 141 S. Ct. at 2230 (quoting *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 739 (1997)).

[111] *Pakdel*, 141 S. Ct. at 2230 (quoting *Horne*, 569 U.S. at 525).

[112] *Barlow & Haun, Inc. v. United States*, 805 F.3d 1049, 1058 (Fed. Cir. 2015).

[113] *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359 (Fed. Cir. 2009).

[114] *Seiber v. United States*, 364 F.3d 1356 (Fed. Cir. 2004).

[115] *Morris v. United States*, 392 F.3d 1372 (Fed. Cir. 2004).

*Cascade Corp. v. United States*,[116] and *Palazzolo v. Rhode Island*.[117] Because each of these cases relies for its authority on the United States Supreme Court's ruling in *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, which has since been overruled, they no longer state the proper rule to be applied in deciding the Government's motion to dismiss.

    *Palazzolo*, although correctly stating that the ripeness doctrine does not require a "landowner to submit applications for their own sake . . . [and] is required to explore development opportunities . . . only if there is uncertainty as to the land's permitted use,"[118] still relied heavily on *Williamson's* now-overruled exhaustion of administrative remedies standard to require a denied permit.[119] *Boise* relied almost entirely on *Williamson*'s "final decision" permit application standard.[120] *Morris,* too, cited *Williamson* to hold that a taking was not ripe until there was a final decision on a permit application.[121] *Seiber* relied on both *Williamson*'s "final decision" standard and *Palazzolo*, which relied on the same *Williamson* standard.[122] *Schooner* also considered ripeness solely based on *Williamson*.[123] Finally, *Barlow* based its ripeness consideration on *Morris*, citing *Williamson*.[124] Each and every case referenced in the decision granting

---

[116] *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002).
[117] *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001).
[118] *Id.* at 622.
[119] *Id.*
[120] *See Cascade Corp.*, 296 F.3d at 1351.
[121] *See Morris*, 392 F.3d at 1376.
[122] *See Seiber*, 364 F.3d at 1365.
[123] *See Schooner Harbor Ventures, Inc.*, 569 F.3d at 1365.
[124] *See Barlow & Haun, Inc.*, 805 F.3d at 1058.

dismissal of Doyle's takings claim was based on and relied on *Williamson* for the proposition that Doyle's taking claim was not ripe because he had not personally applied for and been denied a permit.

In reversing *Williamson County* and the litany of cases that followed it, the Supreme Court made clear that the exhaustion of administrative remedies requirement created in the wake of *Williamson* no longer applies, stating, "*Williamson County* was not just wrong. Its reasoning was exceptionally ill founded and conflicted with much of our takings jurisprudence."[125] The Government's argument for dismissal, relying on these cases, is also contrary to present Supreme Court takings jurisprudence—and so must fail.

The Government incorrectly argues that the reversal of *Williamson* only applies to taking cases brought against state agencies under 42 U.S.C. § 1983.[126] But *Knick* and *Pakdel* did not announce a rule of statutory construction—they announced a principle of Fifth Amendment jurisprudence equally applicable to Tucker Act cases. In *Knick*, the Supreme Court cited a case arising in the Claims Court, *Jacobs v. United States*,[127] for the rule that "[t]he Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner,'"[128] stating: "We have held that if there is a taking, the claim is 'founded upon the

---

[125] *Knick*, 139 S. Ct. at 2178.
[126] Mot. to Dismiss and Mem. of Def. at 13 (Sept. 6, 2022), ECF No. 8.
[127] *Jacobs v. United States*, 290 U.S. 13 (1933).
[128] *Knick*, 139 S. Ct. at 2170.

Constitution' and within the jurisdiction of the Court of Claims to hear and determine."[129]

The Government erroneously states that Paragraph 28 of Doyle's Complaint asserts that *Knick* and *Pakdel* overruled the finality requirement of Williamson County. But what Paragraph 28 actually states—quite correctly—is that "in two recent cases the Supreme Court has overruled the *Williamson County* exhaustion of administrative remedies requirement on which this Court relied in dismissing Doyle's prior suit."[130]

What the Supreme Court reversed in *Pakdel* was the "Ninth Circuit's demand that a plaintiff seek 'an exemption through the prescribed procedures,'" because this "plainly requires exhaustion."[131] The Government's argument that *Pakdel* only reversed the second *Williamson* holding—the holding pertaining to compensation and remedy—is entirely incorrect. *Knick*, decided two years before *Pakdel*, overruled *Williamson*'s second (compensation) ripeness requirement.[132] By the time *Pakdel* came before the Court, the remaining issue was *Williamson*'s first requirement (exhaustion of remedies)—which the Supreme Court invalidated: "Congress always has the option of imposing a strict administrative-exhaustion requirement. . . . But it has not done so for takings plaintiffs."[133]

---

[129] *Knick*, 139 S. Ct. at 2170 (2019) (quoting *United States v. Causby*, 328 U.S. 256, 267 (1946) (internal quotations omitted)).

[130] Compl. for Fifth Amendment Just Compensation ¶ 28 (May 6, 2022), ECF No. 1.

[131] *Pakdel*, 141 S. Ct. at 2230.

[132] *Knick*, 139 S. Ct. at 2179.

[133] *Pakdel*, 141 S. Ct. at 2231.

### 2. There is No Question About How the Endangered Species Act Requirements Apply to Doyle's Property

Stripped of the now-overruled requirement that Doyle exhaust the agency's administrative remedies, there is no question that his taking claim amply satisfies the finality requirement announced by the Supreme Court in *Pakdel*—which is "relatively modest"—that "[a]ll a plaintiff must show is that 'there [is] no question ... about how the regulations at issue apply to the particular land in question.'"[134]

Under the Endangered Species Act, once the Fish and Wildlife Service listed the tortoise as endangered, it became unlawful to "take" a single tortoise—take being defined under the ESA as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[135] Under ESA regulations, "take" may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."[136] Violations were punishable by huge civil penalties or imprisonment. The listing of the tortoise in 1990 immediately made Doyle's planned development of his property illegal, destroying the fruits of all of his work up to that date.

As an additional overlay, the Service also designated Doyle's land as critical habitat for the tortoise, subjecting his property to yet another ESA regulatory scheme.

---

[134] *Pakdel*, 141 S. Ct. at 2230 (quoting *Suitum*, 520 U.S. at 739) (internal quotations omitted).
[135] 16 U.S.C. § 1532(19).
[136] 50 C.F.R. § 17.3.

Under ESA regulations, activity within a designated critical habitat area must not be "likely to . . . result[] in the destruction or adverse modification of critical habitat."[137]

As Doyle's Complaint states: "These actions of the Government brought Doyle's development, and the development plans for most of Washington County, to an abrupt end because disturbance of habitat of a listed species is prohibited by the Endangered Species Act, on penalty of civil and criminal liability."[138] These regulations had, in short, taken Doyle's property without just compensation, giving immediate rise to his Fifth Amendment claim.[139]

Undaunted, Doyle spearheaded an effort together with local governments and other landowners to prepare and submit a Habitat Conservation Plan to the Fish and Wildlife Service, requesting an Incidental Take Permit that would allow development of some of Doyle's (and other owners') land while "establish[ing] a 27,000-acre reserve to protect the tortoise habitat . . . ."[140] But the Fish and Wildlife Service rejected Doyle's proposal—leaving his land undevelopable. And so, it has remained ever since.

Today, there is no genuine question as to whether Doyle will be allowed to develop his land within Zone 3, which is the core protected area of the Reserve.[141] There is also no question about how the Government's regulations, in this case, apply to Doyle's

---

[137] 50 C.F.R. § 402.01; *see also* 50 C.F.R. § 424.12 (Criteria for designating critical habitat).

[138] 16 U.S.C. § 1538.

[139] *Knick*, 139 S. Ct. at 2170 ("The Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner."); *see also Pakdel*, 141 S. Ct. 2226.

[140] Ex. 3 at ¶ 4.

[141] *See* Ex. 2 ¶ 4 .

property. Doyle actively participated in creating and submitting Washington County's HCP and ITP applications with FWS. Fully participating on the standing committee that drafted the HCP, Doyle had personal knowledge that the primary difference between the initial HCP that FWS rejected, and the HCP that FWS accepted, was the inclusion of Doyle's property—not just within the broad HCP area but specifically in the Reserve Lands where incidental take, and residential development, was expressly not a recognized "covered" activity.[142]

Having insisted that Doyle's property be included in the core of the Reserve area in order for Washington County's ITP to be approved, it is disingenuous for the Government to argue that Doyle's taking claim is still not ripe because Doyle never tried to exempt his property from Washington County's ITP and create his own HCP and EIS to apply for a personal permit.

The Government's argument that Doyle's claim will not ripen until he goes completely through the motions of applying for an incidental take permit would require an accompanying habitat conservation plan and environmental impact statement and require him to dedicate years and incur substantial financial burdens. Each case cited by the Defendant regarding ripeness relied on *Williamson*. Unfortunately, the effect of the trial court's prior dismissal has operated as a de facto prospective injunction preventing Doyle from seeking just compensation through the Court unless and until he exhausts his

---

[142] Ex. 1 at i-ii.

administrative remedies by expending additional resources to create his own personal HCP, EIS, and ITP application for the Government to then reject summarily.

### 3. Under the Government's Theory, At No Time Will Doyle's Claim Ever Be Ripe for Review

The futility of seeking just compensation through Washington County's HCP became crystal clear when Doyle was told by local officials that he would not receive any more offers because the county believed Doyle would use the money from the sale to sue the county.

Doyle repeatedly tried to exclude his property from the Reserve Lands to allow some development on his land, but the FWS rejected that proposal, and instead demanded that his property be included in the area where incidental take was prohibited. Doyle endeavored to work with the Government on land purchases and exchanges for the just compensation that was promised.[143] Through no fault of Doyle's, he has still not received just compensation, while the Government now owns a significant portion of his land purchased from his creditors after Doyle lost his property to bankruptcy.[144]

### 4. Doyle's Taking Claim is Not Time-Barred

The Government relegates its statute of limitations argument to a single footnote.[145] The Federal Circuit has held that arguments raised solely in footnotes are neither properly raised nor preserved.[146] Having neither developed nor supported this

---

[143] *See* Ex. 3 at ¶¶ 7-11; *see also* Ex. 2 at ¶ 8.
[144] *See* Compl. at 12.
[145] Mot. to Dismiss and Mem. of Def. at 14, n.2 (Sept. 6, 2022), ECF No. 8.
[146] *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

argument in its motion to dismiss, the Government has waived the right to develop this argument for the first time in its reply brief.[147]

In addition, the Government argued in the previous lawsuit that Doyle's taking claim presented for review, in that case, was time-barred, and the trial court rejected that argument.[148] Therefore, the Government is now estopped from raising again an argument that was litigated and on which it was unsuccessful.[149]

**Conclusion**

In the book *Catch-22*, the author describes absurd bureaucratic constraints on soldiers in World War II. The book depicts an army psychiatrist who explains that any pilot requesting a mental evaluation for insanity—hoping to be found not sane enough to fly and thereby escape dangerous missions: "'You mean there's a catch?' 'Sure there's a catch,' Doc Daneeka replied. 'Catch-22. Anyone who wants to get out of combat duty isn't really crazy.'"[150]

Here too, Mr. Doyle, who is now in his mid-eighties, has been caught for decades in the FWS's own version of a Catch-22. Although he has been willing to sell or exchange his land within the Reserve to the Government, the Government has only been willing to buy some of his land. Unable to develop his remaining land and bring in an

---

[147] *See Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 91 (1st Cir. 2004) ("When a party includes no developed argumentation on a point . . . we treat the argument as waived under our well established rule.").

[148] *See Doyle*, 129 Fed. Cl. at 158.

[149] *New Hampshire v. Maine*, 532 U.S. 742, 748-749 (2001) (Issue preclusion bars "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.").

[150] JOSEPH HELLER, CATCH-22 (1961).

income, he was forced into bankruptcy, in which he lost a significant amount of acreage, which the Government promptly bought out of bankruptcy for pennies on the dollar. And although he participated in one HCP process, which FWS rejected because it did not include Doyle's land for the tortoise, it now refuses to even process his current permit application because Doyle has not submitted the requisite HCP, requiring an extremely costly NEPA review process which would laboriously produce a result that is already known: Doyle cannot construct residential housing in the most environmentally sensitive area for tortoise habitat protection.

Doyle asks this Court to deny the Government's motion for failure to exhaust administrative remedies and hold that his taking claim is ripe for review.

Dated: November 3, 2022                           Respectfully submitted,

                                                  s/Roger J. Marzulla
                                                  Roger J. Marzulla
                                                  Nancie G. Marzulla
                                                  MARZULLA LAW, LLC
                                                  1150 Connecticut Avenue, NW
                                                  Suite 1050
                                                  Washington, DC 20036
                                                  (202) 822-6760
                                                  roger@marzulla.com
                                                  nancie@marzulla.com

                                                  Counsel for Plaintiffs